Filed 12/24/13  Signs v. Brzezinski CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LORI SIGNS, | D062825 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2012-00099114-CU-HR-CLT) |
| CHARLES BRZEZINSKI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Leo Valentine, Jr., Judge.  Affirmed.

Stephen Temko and Dennis Temko for Defendant and Appellant.

Lori Signs, in pro. per., for Plaintiff and Respondent.

Defendant Charles Brzezinski challenges the sufficiency of the evidence supporting the trial court's issuance of a civil harassment restraining order against him.  He further contends the court abused its discretion when it denied his motion for a new trial.  We affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Civil Harassment Restraining Order*

On June 18, 2012, plaintiff Lori Signs testified at a hearing in which her friend, Lisa

Reimer, sought a domestic violence restraining order against Brzezinski.  Heather Keznetzoff,

who is Signs's niece and lives with Signs, and Carolyn Crow, who is Signs's assistant, also

attended the hearing as potential witnesses, but neither was called to testify.  Immediately after

the hearing, events occurred outside the courthouse that led Signs to seek her own restraining

order against Brzezinski.

Signs filed a Request for Civil Harassment Restraining Orders form (the Request Form)

seeking to restrain Brzezinski from harassing Signs, Keznetzoff, and Crow.  Signs alleged

under oath in the Request Form that "as [Signs, Keznetzoff, and Crow] left the courthouse,

[Brzezinski] roll[ed] down his Dodge pickup window and yelled[,] 'I'm gonna get all of you

just wait.' "  Signs included on the Request Form prior instances of harassment by Brzezinski,

including that he "stalked [her] to Palm Springs, shows up unannounced in many public places,

trespasses on [her properties], [and] sends threatening texts[.]"  Signs further stated that she felt

"scared," "threatened," and "went back into [the] courthouse to seek protection."

Signs supported her restraining order request with substantially similar declarations

from herself, Keznetzoff, and Crow.  Signs's declaration described the incident as follows:

> "As I exited the courthouse [Brzezinski] pulled up in his Dodge pick-
> up (black), rolled down his window[,] with rage[,] anger and violence in
> his voice, he screamed out and pointed at us[,] I'm coming after you!  I
> (we) ran back into the courthouse (knowing his past history of violence)[,]
> told the courthouse about the incident and they directed me to request this
> order for my safety and protection.  We are single women who[] live

2

alone and are in fear for our lives. We have a witness that has seen the entire incident."

The court immediately issued a temporary restraining order protecting Signs, Keznetzoff, and Crow and set a further hearing on a restraining order for July 10, 2012.

Brzezinski opposed the request, denying that the courthouse or any prior harassment had occurred. He claimed in a declaration that at the time of the alleged courthouse incident he was speaking on his cell phone to Allison Masters, the mother of his children, and that she would corroborate that she did not hear Brzezinski yell.[1] His declaration also contained a request for a continuance to obtain discovery from the courthouse surveillance cameras, which he claimed would establish the incident did not occur.

In reply, Signs submitted the declaration of a bystander who witnessed the courthouse incident and stated it had occurred as Signs said. Signs and Crow also submitted declarations stating that Crow works only a few blocks from Brzezinski's residence and reiterating Crow's request that the restraining order continue to protect her from Brzezinski.

At the outset of the July 10, 2012, hearing, Brzezinski requested a continuance so he could depose Signs. The court denied the request, suggesting Brzezinski might obtain the equivalent of a deposition by examining Signs under oath during the hearing. The court heard testimony from Signs, Brzezinski, and Crow.

Signs testified about her relationship with Brzezinski and his prior harassment of her. She denied ever having an intimate relationship or living with him. She described attending a concert in Palm Springs during which Brzezinski "came up and went in [her] face and was, 'boo,' like trying to intimidate [her]. [Signs] was like 'oh, my gosh, he's here.' " Signs also

---

[1]    Masters did, in fact, submit such a declaration.

3

testified that on several occasions when she was having her nails done, Brzezinski entered the shop and stared at her the whole time. She also described instances when she was boating at lakes and Brzezinski appeared "just out of nowhere." She described text messages Brzezinski sent her within the past two years in which he stated "I'm going to get you," "you and I belong together," and "you know we belong together." Signs explained that these incidents had occurred over the course of years and that they seemed to subside (though not completely) when Brzezinski was in a romantic relationship but would resume when the relationship ended.

As for the courthouse incident, Signs testified that after she left the June 18 hearing, she encountered Brzezinski at the corner of Ash Street and Sixth Avenue. He was in his truck on the opposite side of the street with the passenger window rolled down. Signs testified that she "heard screaming, just violent screaming," at which point she "[j]ust froze." Brzezinski then pointed his finger at Signs, Keznetzoff, and Crow, and screamed obscenities, saying "I'm going to get all of you. Just wait. I'm coming after you." Signs testified that she attempted to obtain security camera footage from nearby businesses but was told none existed.

Brzezinski then testified that he had been in a sexual relationship with Signs in 2003 and had lived primarily at her house for about nine months. He denied stalking Signs to the Palm Springs concert, sending her any texts within the past two years, or seeing her at nail salons within the past several years. Brzezinski admitted that he and another woman were ordered by a court to attend anger management classes in another domestic violence case, but he denied he had hit the woman.

Regarding the courthouse incident, Brzezinski acknowledged seeing Keznetzoff and Crow (but not Signs) from his truck at an intersection near the courthouse and that his

4

passenger window was rolled down because it was a hot day and his truck was black. Brzezinski claimed, however, it was Keznetzoff and Crow who yelled, cursed, and made obscene hand gestures toward him. He maintained that he was speaking to Masters on his cell phone at the time and did not say a word to Keznetzoff or Crow but, rather, rolled up his window, ignored the women, and drove off.

Crow testified that she has known Signs for over 30 years and has never known Signs to have dated or lived with Brzezinski. Crow then described two courthouse incidents involving Brzezinski on June 18. The first occurred at the intersection of Cedar and Ash Streets[2] and involved Crow, Keznetzoff, and Brzezinski (but not Signs). Crow testified Brzezinski rolled down the window of his truck and "very enraged," yelled "I'm going to get you all. I'm coming after you." Crow stated she was frozen in fear and was terrified of Brzezinski. Crow and Keznetzoff then returned to the courthouse and informed a bailiff and Signs what had occurred. Crow, Signs, and Keznetzoff then left the courthouse to walk to a different court location to process restraining order paperwork against Brzezinski.

According to Crow, that's when the second incident occurred, this time at the corner of Ash Street and Sixth Avenue. Signs was present on this occasion. Brzezinski allegedly "screamed the same type of obscenities out the window in a very threatening type of manner that [Crow] took very seriously." Crow explained on cross-examination that her declaration did not distinguish between the two incidents because she viewed them both as "the same thing, he had attacked us"; she was unfamiliar with restraining order proceedings; and she was

---

2    References elsewhere in the record suggest Crow intended to refer to the intersection of Cedar Street and Sixth Avenue.

rushing because she understood from the legal aid clinic at the courthouse that she had to meet a 1:00 p.m. deadline in order to obtain a restraining order that same day.

The court found by clear and convincing evidence that a restraining order was warranted:

> "I based it upon the testimony of both Ms. Signs and Ms. Crow. I am satisfied that they have indicated that there were threats made against them; that it's clear to me from the physical appearance of Ms. Crow when she testified that she is disturbed, she is concerned, she looked frightened to the court. And to the extent that she testified that she was not a witness in the [June 18] proceeding and that these comments were made to her, I am satisfied by clear and convincing evidence that those comments were made."

Accordingly, the court enjoined Brzezinski from contacting or harassing Signs, Keznetzoff, and Crow for three years.

B.     *Brzezinski's New Trial Motion*

Brzezinski timely moved for a new trial on the bases of newly discovered evidence and surprise.[3] The newly discovered evidence took two forms: (1) security camera footage from the courthouse, which Brzezinski contended conclusively established that the courthouse incidents did not happen as Signs and Crow had testified; and (2) cell phone tower data, which he argued showed that he drove home immediately after leaving the courthouse such that a second courthouse incident involving Signs was impossible.

_____

[3]     In connection with the new trial motion, the parties submitted numerous declarations and lodgments further substantiating their respective positions regarding whether Brzezinski had a history of harassment. Because it appears from the record that the trial court did not consider those materials in ruling on the motion, we have not considered them.

The basis for Brzezinski's surprise argument (as it relates to this appeal) was that the Request Form and supporting declarations described only one courthouse incident but Signs and Crow testified about two at the June 18 hearing.

Signs opposed the motion and the court denied it. As to the newly discovered evidence, the court explained that the surveillance videos and cell tower data were merely cumulative of Brzezinski's testimony concerning his whereabouts and, thus, did not constitute truly new evidence. But the court also examined the purported new evidence and explained why it would not have been persuasive in any event. The court described the surveillance videos' lack of continuity and clarity as follows:

> "The court has viewed those videos and, quite frankly, those videos sometimes show a person walking down the street and the very next moment they disappeared. [¶] I'm not sure that the videos are going to assist the court in trying to resolve this dispute. To the extent that it may show people in locations and vehicles moving, for the record, there is no audio on those tapes. Those tapes are depictions of -- it appears to be part of what is happening outside the premises, but, again, as I said, some of the vehicles that you see one moment in a position, the very next moment they are not there. [¶] And so I'm not sure how accurate they are and to the extent there is foundation that can be laid, that they would be admissible for purposes of evidentiary value. I suppose the court can look at it and you could probably point out to the court what you believe it depicts. And then it's an interpretation process."

Brzezinski's counsel conceded, as the court had observed, that "there are some sections that do skip."

With regard to Brzezinski's cell phone tower data, the court explained that its recent experience demonstrated the data did not justify a new trial:

> "I have just finished a trial where I heard extensive -- I heard from more experts on cell sites for Sprint. [Counsel], I spent a couple of weeks in a trial where we heard from experts about cell sites and how they work and Sprint. And, quite frankly, depending on the traffic that is going

7

through one cell site, it may bounce a call off another cell site even though it's closest to that cell site. That does not prove anything to the court."

The court also emphasized the "he said, she said" nature of the parties' dispute and explained that it had determined credibility based on the evidence as a whole:

"I have what you filed, documents, declarations from people on one side that says one thing. I have documents and declarations from other people on the other side that says just the opposite. Someone is gravely mistaken or someone is deliberately lying to the court. To the extent you are asking this court to decide what the truth is, the court has to rely upon its own assessment of the credibility of the evidence and make a decision. [¶] To that extent, it's important that the parties understand that that's all the court can do. That does not mean that that is the truth. It just means that's where the evidence has led the court."

"It was this court that was asked to assess that credibility. [¶] I did that. I did that based on many factors. Not just the allegation of what happened on a street, but the history between the parties as well as all the other evidence and the declaration that was brought before the court. So to the extent that you are asking for a new trial because of new evidence, I don't believe there is any new evidence for the court to grant a new trial."

This appeal followed.

II

SUFFICIENCY OF THE EVIDENCE

Brzezinski contends insufficient evidence supports the trial court's conclusions that he harassed the women or that his alleged conduct "would cause a reasonable person to suffer substantial emotional distress, and . . . actually cause[d] substantial emotion distress. . . ." (Code Civ. Proc., § 527.6, subd. (b)(3).)[4] We disagree.

---

[4] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

8

A.      *Overview of Civil Harassment Restraining Orders*

"Section 527.6 was enacted 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' " (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412 (*Brekke*).) "It does so by providing expedited injunctive relief to victims of harassment." (*Ibid*.)

Section 527.6, subdivision (a), states: "A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an injunction prohibiting harassment as provided in this section."

Subdivision (b)(3) of section 527.6 defines "harassment" as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner."

A " '[c]redible threat of violence' " is defined as "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.6, subd. (b)(2).)

A " '[c]ourse of conduct' " that seriously alarms, annoys, or harasses a person and serves no legitimate purpose is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or

9

stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual . . . ."  (§ 527.6, subd. (b)(1).)

A trial court generally must hold a hearing on a section 527.6 petition within 21 days of the court's grant or denial of a temporary restraining order.  (§ 527.6, subd. (g).)  "There is no provision under section 527.6 allowing for discovery, and in any case, . . . there is insufficient time in which to conduct discovery."  (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 650, fn. 11 (*Thomas*).)  "At the hearing, the judge shall receive any testimony that is relevant"— including hearsay—"and may make an independent inquiry."  (§ 527.6, subd. (i); *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 728-729 [hearsay evidence is admissible].)  Consistent with principles governing injunctions generally, an injunction under section 527.6 "is authorized only when it appears that wrongful acts are likely to recur."  (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 402 (*Russell*).)  Thus, while a single act of violence or harassment, standing alone, generally does not *require* the issuance of an injunction, it "may support a conclusion that future harm is highly probable."  (*Id*. at p. 404.)

"If the judge finds by clear and convincing evidence that unlawful harassment exists, an injunction shall issue prohibiting the harassment."  (§ 527.6, subd. (i).)  "In the discretion of the court, on a showing of good cause, [an] injunction issued under [section 527.6] may include other named family or household members."  (§ 527.6, subd. (c).)  The court need not make express findings, but rather, "the granting of the injunction itself necessarily implies that the trial court found that [the respondent] knowingly and willfully engaged in a course of conduct that seriously alarmed, annoyed or harassed [the petitioner], and that [the petitioner]

actually suffered substantial emotional distress." (*Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1112 (*Ensworth*).)

B.       *Standard of Review*

"The appropriate test on appeal is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record." (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188 (*R.D.*).) "We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value." (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762 (*Schild*).) "Inferences may be drawn not only from the evidence but from the demeanor of witnesses and their manner of testifying." (*Ensworth*, *supra*, 224 Cal.App.3d at p. 1110.) "Where the trial court has determined that a party has met the 'clear and convincing' burden, that heavy evidentiary standard then disappears. 'On appeal, the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding appellant's evidence, however strong.' " (*Id*. at p. 1111, fn. 2.)

While we review the sufficiency of the evidence supporting the trial court's factual findings under the substantial evidence standard, the question of "whether [those] facts . . . are legally sufficient to constitute civil harassment under section 527.6 . . . [is a] question[] of law subject to de novo review." (*R.D.*, *supra*, 202 Cal.App.4th at p. 188.)

C.       *Sufficiency of the Evidence*

Brzezinski argues at length that insufficient evidence supports the trial court's threshold finding of harassment because the court based that finding entirely on a single incident at the

11

courthouse. The record, however, contradicts this claim. The court stated its finding of harassment was "based . . . upon the testimony of both Ms. Signs and Ms. Crow." Signs testified that Brzezinski had followed her to Palm Springs, lakes, and nail salons; and had sent her threatening text messages. Crow corroborated Signs's testimony regarding the history of Sign's relationship (or lack thereof) with Brzezinski. Therefore, the trial court's finding as it relates to Signs was not, in fact, based on a single incident.

The finding of harassment as to Keznetzoff and Crow is also supported by substantial evidence. Crow testified there were two incidents at or near the courthouse involving her, Keznetzoff, and Brzezinski. Although the incidents were separated by only minutes, section 527.6, subdivision (b)(1), defines a " '[c]ourse of conduct' " as "a pattern of conduct composed of a series of acts over a period of time, *however short . . . .*" (Italics added.) That Signs was a participant in the second incident, but not the first, lends further weight to the treatment of the two courthouse altercations as separate incidents. Additionally, with respect to Keznetzoff, once the court determined a restraining order was appropriate as to Signs, it was within the court's discretion upon a showing of good cause to extend it to Keznetzoff as a "named family or household member[]." (§ 527.6, subd. (c).)

Furthermore, even if the court's finding of harassment were based on a single incident, that still would not require reversal. Section 527.6's definition of "harassment" includes a " '[c]redible threat of violence,' " which includes "a knowing and willful statement . . . that would place a reasonable person in fear for his or her safety . . . ." (§ 527.6, subd. (b)(2).) Under appropriate circumstances, this plain language allows for a finding of harassment based on a single incident. The cases Brzezinski cites do not establish a blanket rule to the contrary,

12

but rather, demonstrate only that the single incidents at issue there did not establish a likelihood of future harassment. (*Russell*, *supra*, 112 Cal.App.4th at p. 402 [physical encounter between opposing counsel at courthouse unlikely to recur because by the time of the injunction hearing they were no longer adversaries and were unlikely to encounter each other again]; *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 336 [harassment of nurse by patient's son unlikely to recur because patient transferred insurance to a different treatment facility]; *Leydon v. Alexander* (1989) 212 Cal.App.3d 1, 3-4 [terminated employee had not seen petitioner in eight years prior to incident and no indication he would harass her again] (*Leydon*).)[5]

Here, by contrast, the record supports an implied finding by the trial court that—unrestrained—Brzezinski would likely harass Signs, Keznetzoff, and Crow in the future. Because Crow works near Brzezinski's home, it is not unlikely that they would encounter one another again. Crow also testified that Brzezinski views her, Signs, and Keznetzoff as a trio. Therefore, Brzezinski's history of harassing Signs, coupled with his threats of retaliation against Keznetzoff and Crow, support an implied finding by the trial court that Brzezinski was likely to follow through on his threat to Keznetzoff and Crow. (See, e.g., *R.D.*, *supra*, 202 Cal.App.4th at pp. 189-190 ["the court could consider any evidence showing a likelihood of future harassment, including evidence of conduct that might not itself constitute harassment"].)

---

[5]    *Leydon* is further distinguishable because it was decided before the Legislature amended section 527.6 "by adding . . . the 'credible threat of violence' to the definition of harassment along with the 'course of conduct' language. . . ." (*Russell*, *supra*, 112 Cal.App.4th at p. 402.) Thus, now a single incident of harassment "may support a conclusion that future harm is highly probable." (*Id*. at p. 404.)

Also unavailing is Brzezinski's reliance on *Cochran v. Cochran* (1998) 65 Cal.App.4th 488, to support his claim that his "rough language" did not constitute harassment because it was "merely the 'steam' of an irascible temper." *Cochran*, however, examined the "outrageous conduct" element of the tort of intentional infliction of emotional distress (*id.* at p. 494), a standard not applicable to section 527.6. Moreover, key to the *Cochran* court's decision was that it involved "parties to an intimate relationship gone bad [who] were now feuding," and to allow a tort cause of action for every "exchange of hostile unpleasantries" would "needlessly congest our courts with trials for hurts both real and imagined which are best resolved elsewhere." (*Id*. at p. 498.) Although Brzezinski claims he and Signs had been parties to an intimate relationship gone bad, the trial court appears to have found Signs and Crow more credible on this point. Thus, we find *Cochran* inapplicable here.

Brzezinski's contention that his harassment could not have "cause[d] a reasonable person to suffer substantial emotional distress" is also unavailing. (§ 527.6, subd. (b)(3).) His reliance on *People v. Ewing* (1999) 76 Cal.App.4th 199 (*Ewing*), which involved criminal stalking under Penal Code section 646.9, is of limited value. First, *Ewing* involved a criminal statute subject to proof beyond a reasonable doubt, while civil harassment under section 527.6 requires only clear and convincing evidence. (*Ewing*, at p. 209; § 527.6, subd. (i).) Second, in attempting to illuminate the *substantial* emotional distress standard arising under Penal Code section 646.9, the *Ewing* court examined the *severe* emotional distress standard under the tort of intentional infliction of emotional distress. The court acknowledged, however, that those standards are not "synonymous because 'severe' is a stronger adjective than 'substantial.' " (*Ewing*, at p. 210.) It is understandable that the *Ewing* court looked to that analogy, however,

14

because the court in *Schild* had also done so in the context of section 527.6. Indeed, in considering the standard, both the *Ewing* and *Schild* courts observed that some degree of emotional distress is inherent in a modern society: a "reasonable person must realize that complete emotional tranquility is seldom attainable, and some degree of transitory emotional distress is the natural consequence of living among other people in an urban or suburban environment." (*Schild*, *supra*, 232 Cal.App.3d at pp. 763, 762; *Ewing*, at p. 210.)[6] But even *Schild* is of limited value to Brzezinski because the "harassment" in that case was—quite literally—child's play compared to Brzezinski's conduct here: it involved "noise from a ball and the verbal chatter by several people engaged in recreational basketball play in the residential backyard . . . playing at reasonable times of the day for less than 30 minutes at a time and no more than five times per week . . . ." (*Schild*, at p. 761.) Not surprisingly, then, other courts addressing harassment under section 527.6 have found *Schild's* analysis inapplicable to more severe conduct. (See, e.g., *Brekke v. Wills*, *supra*, 125 Cal.App.4th at p. 1414 [defendant "cannot expect us to equate his contemptuous conduct [of sending threatening letters to his teenage girlfriend's mother] with the act of children bouncing a basketball"].) "[Interrupting] Saturday and Sunday afternoon naps" with basketball (*Schild*, at p. 758), differs materially from threatening retaliation for testifying at a domestic violence restraining order hearing. Thus, we, too, find *Ewing* and *Schild* inapplicable here and are unpersuaded that Brzezinski's conduct could not "cause a reasonable person to suffer substantial emotional distress . . . ." (§ 527.6, subd. (b)(3).)

---

6    Brzezinski's opening brief quotes this passage from *Ewing*.

Nor are we persuaded by Brzezinski's argument that insufficient evidence supports the trial court's finding that Signs, Keznetzoff, and Crow actually suffered substantial emotional distress. The Request Form states in several places that Signs feared Brzezinski and was in fear for her life. Her declaration states, "We are single women who[] live alone and are in fear for our lives." At the hearing, Signs testified she believed Brzezinski ha[d] a history of violence and, therefore, "begg[ed] for protection from him . . . ." At the conclusion of the hearing, she requested an escort from the courthouse to her vehicle.

Crow's declaration stated she took Brzezinski's threat "very literally." She testified at the hearing that she is terrified of Brzezinski and "froze[] in fear" when he threatened her. Crow explained that she "think[s] [Brzezinski] looks at [Signs, Keznetzoff, and Crow] as a trio, that [they] all know each other and know [Signs]." Based on her testimony, the court stated, "It is clear to me from the physical appearance of Ms. Crow when she testified that she is disturbed, she is concerned, she looked frightened to the court."

Keznetzoff's declaration states, "[w]e are single women who[] live alone and in fear for our lives." At the hearing, Signs represented to the court that Keznetzoff was available to "state the same testimony" as Crow. In the interest of time, however, Keznetzoff did not testify.

This direct evidence in the form of declarations and live testimony is sufficient to establish each of the women actually suffered substantial emotional distress at the hands of Brzezinski. (See Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact."].) It also constitutes sufficient evidence from which the trial court could have drawn

16

reasonable inferences further supporting its findings.  (*Ensworth, supra,* 224 Cal.App.3d at p. 1110 ["Inferences may be drawn not only from the evidence but from the demeanor of witnesses and their manner of testifying."].)

Accordingly, we find substantial evidence supports the trial court's issuance of the restraining order.

## III

## ABUSE OF DISCRETION

Brzezinski also contends the trial court abused its discretion when it denied his motion for a new trial, which was based on the alternate grounds of newly discovered evidence and surprise.  We disagree on both grounds and affirm.

A.    *Newly Discovered Evidence*

"The trial court may grant a new trial on the basis of newly discovered evidence where the moving party shows the evidence is newly discovered, reasonable diligence has been exercised in its discovery, and the evidence is material to the moving party's case."  (*Wood v. Jamison* (2008) 167 Cal.App.4th 156, 161 (*Wood*).)  "In the context of a motion for a new trial, 'material' means likely to produce a different result."  (*Ibid.*)

"A trial court's broad discretion in ruling on a motion for new trial is accorded great deference on appeal."  (*Plancarte v. Guardsmark* (2004) 118 Cal.App.4th 640, 645.)  Generally, and "particularly when reviewing an order denying a new trial, the appellate court is required to review the entire record to determine independently whether the error on which the new trial motion is based is prejudicial."  (*Ibid.*)  But an exception applies when the motion was denied by the same judge to whom the case was tried:

17

"There is always some conjecture in determining whether newly discovered evidence was likely to produce a different result where the case was tried to a jury. No one can say with certainty what the jury might have thought about the evidence. But where, as here, the same trial court to which the case was tried determines the new evidence was unlikely to have made a difference, there is no conjecture. We simply have no basis for contradicting the trial court. (*Wood*, *supra*, 167 Cal.App.4th at p. 161.)

We find this exception dispositive here, as the trial court made clear that neither the surveillance camera footage nor the cell tower data were likely to produce a different outcome.

Contrary to Brzezinski's assertion that "the trial court never evaluated the new evidence," the record reflects that "the court has viewed those videos" and found them lacking in continuity, accuracy, and evidentiary value. Indeed, even Brzezinski's counsel had to concede that "there are some sections that do skip." Further, the record does not establish that the security camera footage from the courthouse would have captured the second altercation, which occurred blocks away. Thus, we cannot say the trial court abused its discretion in denying the new trial based on the surveillance videos.

The same holds true for the cell tower data. As the trial court explained, it had recently "spent a couple of weeks in a trial where [the court] heard from experts about cell sites and how they work and Sprint. . . . That does not prove anything to the court." Indeed, as the trial court suggested, the cell tower data appears, on its face, to lack the reliability and specificity needed to establish Brzezinski's precise locations at precise times. For example, Brzezinski argues in his opening brief that when the first courthouse altercation occurred, cell tower data "showed [he] pinged a tower 1.1 miles from the courthouse" and one minute later pinged another tower 3.9 miles from the courthouse. For Brzezinski to travel that distance in that amount of time would have required him to speed through downtown San Diego at an unlikely

18

120 miles per hour.  It is more likely that the cell tower data simply does not provide the pinpoint accuracy necessary to support Brzezinski's theory.  Accordingly, the trial court did not abuse its discretion in concluding the cell tower data did not justify a new trial.

B.      *Surprise*

"A trial court may order a new trial based on surprise." (*McCoy v. Pacific Maritime Assn*. (2013) 216 Cal.App.4th 283, 305; § 657, subd. 3.)  "The surprise must have detrimentally impacted the party moving for a new trial, but the movant must not have been able to prevent or guard against it by ordinary prudence." (*McCoy*, at p. 305.)

Brzezinski contends surprise occurred when the Request Form and declarations described one courthouse incident, but Signs's and Crow's live testimony described two.  He argues this was prejudicial because if he had known about Signs's two-incident theory he would have obtained the Sprint cell tower data sooner, which he claims would have exonerated him at the hearing.  We are unpersuaded that if any surprise occurred, it was prejudicial.

First, as a general matter, we find the surprise argument less compelling in the context of the expedited hearing procedure required by section 527.6.  For example, even if the pleadings had alleged two separate incidents, it is unlikely Brzezinski could have completed the desired discovery from Sprint by the time of the expedited hearing.  (See, e.g., *Thomas*, *supra*, 126 Cal.App.4th at p. 650, fn. 11 [under § 527.6 "there is insufficient time in which to conduct discovery"].)  Moreover, we likely would not have found an abuse of discretion if the trial court had denied Brzezinski a continuance to allow for discovery—if anything, *granting* such a continuance might have been an abuse of discretion.  (*Thomas*, at p. 650 [it "could arguably be an abuse of discretion if a trial court allowed discovery to go forward at a time, or

19

in a manner, which interfered in any way with the prompt hearing on a petition under § 527.6"].)[7]  Therefore, simply by virtue of the expedited nature of section 527.6 hearings, we surmise there may always exist a certain amount of unavoidable surprise in such proceedings.

Second, any surprise that prevented Brzezinski from obtaining discovery from Sprint prior to the hearing was not prejudicial because, as discussed above, the trial court considered the Sprint data in the context of Brzezinski's new-evidence argument and found it unpersuasive.  It is therefore unlikely that a different outcome would have resulted if Brzezinski had obtained such data sooner.

Brzezinski raises other arguments in support of his surprise theory, but we view them as more appropriately aimed at the sufficiency of the evidence supporting the restraining order. Because we concluded above that substantial evidence supports the issuance of the restraining order, we will not address those other arguments here.

IV

DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.

McCONNELL, P. J.

WE CONCUR:

NARES, J.

O'ROURKE, J.

---

[7]    We note that while one ground for Brzezinski's new trial motion was the trial court's denial of his motion for a continuance to conduct discovery, he does not appeal that ruling here.

20